## UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOEL HABICH, individually and on behalf of a class of persons similarly situated, | ) ) | |
| | ) | Case No. 22 CV 4438 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Removed from: |
| EXELON CORPORATION, | ) | Circuit Court of Cook County |
| COMMONWEALTH EDISON | ) | Illinois |
| COMPANY, | ) | Case No. 2022L006413 |
| ACLARA TECHNOLOGIES, LLC | ) | |
| AND | ) | |
| ACLARA METERS LLC | ) | |
| | ) | |
| Defendants. | ) | |

_____

## THIRD AMENDED CLASS ACTION COMPLAINT

The Plaintiff, JOEL HABICH, individually and on behalf of a class of persons similarly situated, through their attorneys, GLEN J. DUNN & ASSOCIATES LTD, and for their Complaint against the Defendants, EXELON CORPORATION and COMMONWEALTH EDISON COMPANY, ACLARA TECHNOLOGIES, LLC, and ACLARA METERS LLC, states:

## THE PARTIES AND JURISDICTION

1)      Defendant, EXELON CORPORATION ("Exelon" or "Exelon Corp"), is an American Fortune 100 Energy Company, incorporated in the State of Pennsylvania.

2)      Exelon Corporation is headquartered in Chicago at 10 South Dearborn Street, Chicago, IL – 60603.

3)      EXELON CORPORATION owns subsidiary company Defendant COMMONWEALTH EDISON COMPANY ("ComEd").

1

4)      ComEd is an electric utility company, headquartered at 442 South LaSalle Street, Chicago, IL – 60605.

5)      Exelon Corporation owns other subsidiaries including Baltimore Gas and Electric (BGE), PECO Energy Company (PECO), Atlantic City Electric, Delmarva Power and Pepco (owned through Pepco Holding).

6)      Exelon, through these subsidiary business units, delivers power service to more than 10 million customers.

7)      Defendant, ComEd, regularly and continuously did business within the State of Illinois by delivering power to over 3.8 million homes and businesses across Illinois.

8)      Putative class members of the ComEd sub-class are residents in the State of Illinois who received electrical services from ComEd and had a Aclara I210+C smart meter installed at their residential and/or commercial building who experienced a combustion event that had its origin at or near the Smart Meter pedestal.

9)      Baltimore Gas and Electric ("BGE") is a subsidiary of Defendant Exelon that regularly and continuously does business in the State of Maryland, by delivering power and electricity services to Central Maryland for more than 200 years.

10)      Putative class members of the BGE sub-class are residents in the State of Maryland who received electrical power service from BGE and had a Aclara I210+C smart meter installed at their residential and/or commercial building who experienced a combustion event that had its origin at or near the Smart Meter pedestal.

11)      Delmarva Power ("Delmarva") is a subsidiary of Defendant Exelon that regularly and continuously does business in the states of Delaware and Maryland, by delivering power services to approximately 532,000 customers (324,000 in Delaware, and 208,000 in Maryland).

12)     Delmarva's employees include employees from its parent corporations, Pepco Holdings ("Pepco") and Exelon Corporation.

13)     Putative class members of the Delmarva sub-class are residents in the States of Delaware and Maryland who received electrical power service from Delmarva and had a Aclara I210+C smart meter installed at their residential and/or commercial building who experienced a combustion event that had its origin at or near the Smart Meter pedestal.

14)     PECO is a subsidiary of Defendant Exelon that regularly and continuously does business in the state of Pennsylvania, by delivering power services to approximately 1.7 million customers and is the largest electric and natural gas utility in the state of Pennsylvania.

15)     Putative class members of the PECO sub-class are residents in the State of Pennsylvania who received electrical power service from PECO and had a Aclara I210+C smart meter installed at their residential and/or commercial building who experienced a combustion event that had its origin at or near the Smart Meter pedestal.

16)     Atlantic City Electric ("ACE") is a subsidiary of Defendant Exelon that regularly and continuously does business in the State of New Jersey, by delivering power services to approximately 560,000 electric customers.

17)     Putative class members of the ACE sub-class are residents in the State of New Jersey who received electrical power service from ACE and had a Aclara I210+C smart meter installed at their residential and/or commercial building who experienced a combustion event that had its origin at or near the Smart Meter pedestal.

18)     Pepco is a subsidiary of Defendant Exelon that regularly and continuously does business in the State of Maryland and the District of Columbia, by delivering power service to approximately 894,000 customers.

19) Putative class members of the Pepco sub-class are residents in the State of Maryland and the District of Columbia who received electrical power service from Pepco and had a Aclara I210+C smart meter installed at their residential and/or commercial building who experienced a combustion event that had its origin at or near the Smart Meter pedestal.

20) Exelon Corporation provides electrical power service to its customers through ACE, BGE, ComEd, Delmarva Power, PECO, and Pepco, and Exelon provides shared corporate services across all the above entities through another wholly owned subsidiary, Exelon Business Services LLC.

21) Exelon Corporation oversees and shares business operations across all six above-mentioned power service subsidiaries.

22) Exelon Corporation has such unity of ownership over its wholly owned subsidiaries such that the individual entities are not separate from the parent Exelon Corporation.

23) Exelon has a unity of ownership with all of its subsidiary units through which it delivers power services.

24) Exelon Corporation indirectly owns 100% of all the entities listed above, including without limitation ACE, BGE, ComEd, Delmarva Power, PECO, Pepco and Exelon Business Services LLC

25) Exelon corporation conducts substantially all of its business operations through its subsidiaries.

26) Pepco, Delmarva, and ACE, as of October of 2023, represent in their public-facing websites that each of those subsidiaries has the same leadership executive team.

27) As of October of 2023, Exelon's public-facing corporate website contains links to the websites of each of its electric power service subsidiaries, which represent that the majority

of the members of the executive leadership on each of the six power service subsidiary units also sit on the Exelon Board of Directors.

28)     As of October of 2023, the public-facing websites of the six Exelon electric power service subsidiaries - namely ACE, BGE, ComEd, Delmarva Power, PECO, and Pepco – show that all six have some common directors and/or officers.

29)     Exelon's President and Chief Executive Officer is Calvin Butler.

30)     Calvin Butler is responsible for overseeing all of Exelon's six power service subsidiaries identified above.

31)     David Glockner is the Executive Vice President, Compliance, Audit & Risk for Exelon Corporation and all of its operating companies.

32)     David Glockner is responsible for ensuring that the company and its employees across ACE, BGE, ComEd, Delmarva Power, PECO, and Pepco remain in compliance with all laws, regulations, and internal and external policies affecting Exelon.

33)     Jeanne Jones is the Executive Vice President and Chief Financial Officer of Exelon Corporation.

34)     Jeanne Jones also serves on the Exelon Executive Committee.

35)     The Exelon Executive Committee sets strategy and direction for the entire company, including subsidiaries: ACE, BGE, ComEd, Delmarva Power, PECO, and Pepco.

36)     David Velazquez is Exelon's Executive Vice President of Utility operations and Technology.

37)     Velazquez is responsible for cross-utility operations for all six electric power service subsidiaries of Exelon.

38) Exelon Corporation makes decisions pertaining to the corporate code of conduct, policies and procedures to be followed by all six power service subsidiaries.

39) Exelon Corporation treats the employees of its six electric power service subsidiaries as its own.

40) Exelon exerts complete ownership over the assets of its six electric power service subsidiaries.

41) Exelon Corporation, through its public facing website, holds itself out to the public as "a utility holding company" and designates its subsidiaries as "utilities" and "transmission providers," and refers to itself and its subsidiaries as the "Exelon family of companies."

42) Exelon disregards the spurious "individual" corporate structure of the above mentioned subsidiary entities and/or units, and states in its public-facing website as of October, 2023 that: "Exelon is a Fortune 250 company and the nation's largest energy delivery company, serving more than 10 million customers through six fully regulated transmission and distribution utilities – Atlantic City Electric (ACE), Baltimore Gas and Electric (BGE), Commonwealth Edison (ComEd), Delmarva Power and Light (DPL), PECO Energy Company (PECO) and Potomac Electric Power Company (PEPCO)."

43) Exelon Corporation treats ACE, BGE, ComEd, Delmarva Power, PECO, and Pepco as departments or divisions of Exelon, rather than independent corporations.

44) Exelon's public-facing website also states, as of October, 2023, that: "More than 18,000 Exelon employees dedicate their time and expertise to powering a cleaner and brighter future for our customers and communities …"

45) Exelon's Chief Compliance Officer regulates compliance across all six-power service subsidiary business units.

46) Exelon Business Services LLC is a wholly owned subsidiary of Exelon.

47) Exelon Business Services LLC purchased the smart meters at issue in this litigation for all six power service subsidiaries.

48) Exelon Corporation designated Exelon Business Services LLC as the agent for the purpose of negotiating the purchase contract to obtain the smart meters at issue in this litigation for all six power service subsidiaries.

49) Exelon's Second Quarter Reports for 2023, a public filing, states "Through the first half of 2023, we have deployed $3.6B of investments needed to lead the energy transformation for our customers" demonstrating that Exelon Corporation does have business operations that it funds itself.

50) Exelon's Second Quarter Reports for 2023, a public filing, under the title "Operating Company results," states that Exelon lists the performance of its subsidiary entities such as ComEd, PECO, BGE, and Pepco and further states, "Exelon's four business units include ComEd, … PECO, …, BGE, … and PHI (Pepco) ..." which demonstrates that Exelon treats these entities as business units and/or divisions of Exelon as opposed to independent corporate entities.

51) On information and belief, Exelon Corporation retains the authority to hire and fire the employees of its six power service subsidiaries.

52) On information and belief, Exelon Corporation retains the authority to control the operative detail of the work the employees of its six power service subsidiaries.

53) On information and belief, Exelon Corporation retains the authority to determine the pay rate of the employees of its six power service subsidiaries.

54)    Exelon exercised such a unity of interest and active decision making in the day-to-day activities of its six power service subsidiaries such that it directly participated in the decisions and/or omissions that led to the events of this lawsuit – namely, selecting the GE/Aclara manufactured I210+c smart meter to be purchased and deployed to the customers of its six power service subsidiaries when it was aware that the I210+C smart meter had a risk of overheating that could lead to an increased risk of arcing, combustion and fire for the customers where it was installed.

55)    Defendant ACLARA TECHNOLOGIES, LLC (a subsidiary of Hubbell Incorporated), is a supplier of Smart Infrastructure Solutions (SIS) to water, gas and electric utilities, headquartered at 77 West Port Plaza Drive, St. Louis, MO – 63146 and is one manufacturer of the Electric Smart Meters supplied by COMMONWEALTH EDISON COMPANY, including the Electric Smart Meter supplied to the Plaintiff.

56)    Defendant, ACLARA TECHNOLOGIES LLC, regularly and continuously did business within the State of Illinois, by marketing, selling, distributing, and providing training and other services associated with the supply of Smart Infrastructure Solutions (SIS) to water, gas and electric utilities, including but not limited to the I-210 line of single phase residential electric meters.

57)    Defendant ACLARA METERS LLC (a subsidiary of ACLARA TECHNOLOGIES LLC), is a supplier of Smart Infrastructure Solutions (SIS), with its principal office at 40 Waterview Drive, Shelton, CT – 06484, and is a manufacturer and distributor of the Electric Smart Meters supplied by Defendant COMMONWEALTH EDISON COMPANY, as well as all the other meters purchased and distributed by Exelon to its other subsidiaries listed above, including the Electric Smart Meter supplied to the Plaintiff.

8

58)     Aclara shipped 10,352,000 I-210+c smart meters to all of its customers between 1/1/2016 and 12/31/2020 which continue to be in service and pose an imminent risk of overheating, arcing, fire, explosion or combustion.

59)     From 1/1/2016 through 12/31/2020, Aclara shipped 1,310,504 I-210+c smart meters to Exelon to be distributed amongst Exelon's various accounts.

60)     From 1/1/2016 through 12/31/2020, ComEd received and deployed at least 1,142,000 I-210+c smart meters to its power service customers from those purchased through Exelon.

61)     From 1/1/2016 through 12/31/2020, PEPCO received and deployed at least 42,590 I-210+c smart meters to its power service customers from those purchased through Exelon.

62)     From 1/1/2016 through 12/31/2020, Delmarva received and deployed at least 35,124 I-210+c smart meters to its power service customers from those purchased through Exelon.

63)     From 1/1/2016 through 12/31/2020, BGE received and deployed at least 67,260 I-210+c smart meters to its power service customers from those purchased through Exelon.

64)     From 1/1/2016 through 12/31/2020, ACE received and deployed at least 23,530 I-210+c smart meters to its power service customers from those purchased through Exelon.

65)     Defendant ACLARA METERS LLC acquired the Smart Meter division of General Electronics ("GE") in 2015 and have since been manufacturing and distributing AMI smart meters, including but not limited to the I-210 line of electric smart meters and the I-210+c smart meter. Based on discovery obtained from the Aclara Defendants, the I-210 line of meters are all identical and/or substantially similar in design and operation.

66) The Smart Meters manufactured, supplied, distributed and/or sold by Defendant Aclara Meters LLC, specifically the I-210 line of meters, including I-210+c meters, were all tested together as representative samples, and were approved under a single certificate of compliance, which states "This is to certify that representative samples of Detachable Electric Utility Meters, "i-210" Series, Models 72; followed by 7; followed by X; followed by A, B, C, F, or G; followed by 0, 8, 9, D, or F; followed by 6 or 7; followed by three additional alphanumerical characters have been investigated by UL in accordance with the Standard(s) indicated on this Certificate".

67) The UL certificate testing report provided to Aclara Meters LLC in 2013 shows that the only differences across the various meters in the I-210 line, including I-210+c meters, is based on functionalities, such as voltage, AMI component, On-Ramp wireless features, and a Sensus DT-20 Flexnet component, and whether a service switch is provided with the meter for a remote disconnect. All other manufacturing materials, products, and components, including the lack of a Bakelite backplate and powered wireless components are common for the entire line of I-210 meters, including I-210+c meters.

68) Defendant, ACLARA METERS LLC, regularly and continuously did business within the State of Illinois, Maryland, Pennsylvania, New Jersey, and the District of Columbia, by manufacturing, marketing, distributing and providing training and other services associated with the supply of Smart Infrastructure Solutions to water, gas and electric utilities.

69) Plaintiff brings count I through III as an individual action under 735 ILCS 5/2-209, being a resident of the State of Illinois and as a person who owned and operated a business within the State of Illinois. Plaintiff brings Counts IV as class action under 735 ILCS 5/2-801

against Exelon and/or through its subsidiaries, and counts V and VI as a class action under 735 ILCS 5/2-801 against Aclara Technologies, LLC and Aclara Meters, LLC, respectively.

70)     Plaintiff Joel Habich is a resident and citizen of Cook County, Illinois. He was the owner and operator of the commercial business named "Don's Hot Dogs III," which occupied the premises 7245 West 151st Street, Orland Park, County of Cook, State of Illinois where Exelon, by and through ComEd, delivered electric power service and had installed an Aclara I-210+c Smart Meter on April 6, 2018.

71)     At all relevant times, the Plaintiff and each of the putative class members Plaintiff Joel Habich seeks to represent have received electric power service from Exelon, by and through one of its power service subsidiaries, such as ComEd, BGE, ACE, PECO, Pepco, and Delmarva and have suffered personal and/or property damages as a result of combustion or other fire damage resulting from the use of an Aclara I-210+c smart meter.

## BACKGROUND FACTS

72)     On July 29, 2020, Plaintiff Joel Habich, owned and operated Don's Hot Dogs III, Inc., a commercial business at 7245 West 151st Street, Orland Park, County of Cook, State of Illinois.

73)     Said commercial business was operated from a single-story masonry building at the location, which was owned by the Plaintiff.

74)     The building at the location was supplied with electrical service from Defendant ComEd, a subsidiary of Defendant EXELON CORPORATION, who installed and maintained the electrical service to the building.

75) The electrical service included an Aclara I-210+c electrical smart meter, bearing Meter No. 273403352_G, a smart meter housing unit, a pedestal and a 2-inch supply conduit that attached to the bottom of the smart meter housing, which was installed on April 6, 2018.

76) The smart meter and conduit were affixed and on the south exterior wall of the building. The 2-inch conduit extended down from the meter housing into the ground and connected underground to the external transformer located approximately 10 feet from the south exterior wall, smart meter housing and conduit. Said service was grounded to a copper grounding rod attached to a copper clamp with a galvanized bolt.

77) On July 29, 2020, at approximately 00:40 hours, a structural fire started and destroyed the commercial restaurant at 7245 West 151st Street, Orland Park, County of Cook, State of Illinois and the fire and damages were witnessed by the Plaintiff, Joel Habich.

78) Multiple agencies, including the Office of the Illinois State Fire Marshall investigated the cause and origin of the fire.

79) The area of origin where the fire began, was the south exterior wall of the building at the ComEd electrical smart meter and 2-inch supply conduit.

80) The ignition source of the fire was the energized 120/240 single-phased electrical service from the ComEd pad mounted transformer back to the exterior mounted smart meter pedestal and conduit service chase way attached to the south exterior wall of the building.

81) ComEd arrived at the scene and investigated and acknowledged the same under ComEd "ticket" number #06380439. The work and investigation done by NICOR (gas provider) was done under an unknown "ticket" or incident number.

82) Following the incident, besides the state and local agencies that investigated this occurrence, ComEd retained "Hansen Engineering Services, Inc.", to investigate the cause and

origin of the July 29, 2020 fire and has performed an analysis inclusive of partially destructive testing of the artifacts and other evidence.

83)     Because of the fire, the building at 7245 West 151st street, Orland Park, County of cook, State of Illinois, was destroyed and rendered unusable causing the Plaintiff damages and injuries, including but not limited to lost business, property damage and mental, psychological, emotional and personal injuries caused by Defendants' actions.

84)     The lost business damages include, but are not limited to, the value of the building, value of personal property contained inside the building that was destroyed during the fire, the cost that plaintiff would have to incur in removing the debris and reconstructing the building and business with the relevant equipment, business interruption and lost revenue.

85)     The liabilities, debts and losses incurred as a result of the fire which destroyed the business have been borne by Plaintiff, Joel Habich, individually and as sole owner of Don's Hot Dogs III, Inc, dissolved in November of 2020.

86)     With the assistance of a professional public adjuster, the liabilities, debts and losses incurred by Plaintiff, Joel Habich, were determined to total $653,080.00 of which $419,911.79 have been recouped, thereby leaving Habich with choate damages of $233,168.21.

87)     Plaintiff, Joel Habich, responsible for and having paid the liabilities, debts and losses incurred as a result of the fire is entitled to recoup and recover the remaining damages not recovered, $233,168.21.

88)     EXELON and ComEd have been approved by the Illinois Commerce Commission to implement a Smart Grid Advanced Metering Infrastructure Deployment Plan, a multi-million-dollar plan to upgrade and modernize the electric delivery system.

89)     At all times relevant, EXELON specifically directed the actions of all its subsidiaries, including but not limited to ComEd, and by its ownership interests, commanded the actions of its subsidiaries regarding: the decision to replace the older analog meters with the AMI smart meters; the decision to select smart meters manufactured by the ACLARA Defendants; the time table set by ComEd and other subsidiaries for the installation of the Smart Meters; the policy and procedure adopted by all the subsidiaries, including ComEd, for the installation protocol of the smart meters, and the protocol to be followed by all of the subsidiaries, including ComEd, in the inspection, maintenance and replacement of the Smart Meters.

90)     EXELON undertook this specific course of action which adversely affected third party interests through the agency of its subsidiaries, including but not limited to ComEd, with adequate knowledge about the defects of smart meters, including the ACLARA I-210+c meter, which carried a higher risk of overheating which could lead to arcing, fire and/or explosion.

91)     EXELON undertook this specific course of action of installing defective Smart Meters, including the Aclara I-210+c meter, with the motive of maximizing corporate profit by obtaining individual electricity consumption data per consumer and reducing service call costs associated with onsite disconnect service.

92)     Under approval from the ICC and in accordance with EXELON's specific instructions and directions, ComEd installed new AMI smart meters and replacing the older non-AMI meters and provided the consumer with a General Terms and Conditions.

93)     ComEd unambiguously states that all meter-related equipment provided by the Company at a retail customer's premises, to measure electric service provided to the retail customer, unless otherwise expressly provided, are the property of the Company.

94)     ComEd in its General Terms and Conditions states that the Company owns, installs, operates, replaces and maintains meter-related facilities in the provision of electric service to the retail customer and that such installation would be governed by the Terms in the General Terms and Conditions.

95)     ComEd states that a trained meter installer visually inspects the meter fitting prior to installing the AMI meter and only where the installer identifies no lack of compliance with the applicable Company and/or Safety Standards, the non-AMI meter is removed and replaced with the AMI meter.

96)     ComEd willfully, wantonly and negligently installed defective smart meters in several properties, after identifying those properties met the applicable safety standards, even though they had prior knowledge that the AMI Smart Meters they installed had an elevated risk of overheating, which could lead to arcing, fire and/or explosion.

97)     As early as 2012, ComEd knew of the AMI Smart Meters causing "small fires."

98)      There were several instances were ComEd acknowledged that the fire was directly linked to the Smart Meter but did not stop or pause installation to cure or otherwise address the known risk of overheating, arcing, fire and/or explosion.

99)     This policy was implemented in accordance with the specific instructions, directives and authorization issued by ComEd'S parent, EXELON.

100)     ComEd issued a statement, given those incidents of fire, that technicians would inspect for, and if found, modify the connection point when needed during the deployment of smart meters.

101)     There have been several incidents since 2012, where the same issues regarding the lack of the Bakelite backplate, the remote connectivity function and the sockets have caused

a fire, leading to various degrees of personal and property damages which continues to present consumers with an unreasonable risk of overheating, arcing, fire, explosion or combustion leading to the destruction of personal and real property and physical injuries.

102)     Under reasonable information and belief, all of the subsidiaries of Exelon Corporation, ComEd, BGE, ACE, PECO, PEPCO, and Delmarva operated, installed, maintained, repaired and replaced these I-210+c smart meters, under the guidance and direction of Exelon's corporate policies and procedures.

103)     The product manual on the Aclara I-210+c manual states that the buyer would be responsible for the installation, maintenance, repair, and/or replacement of the smart meters.

104)     UL testing materials and reports also indicate that Exelon, ComEd, and Aclara were all on reasonable notice that the I-210 line of smart meters, including the I-210+c meter, had issues relating to overheating, arcing, and other combustion events.

105)     Aclara Meters LLC continued and continues to manufacture and distribute these meters despite their knowledge of the inherent risks and defects, and did so without warning its customers which continues to present consumers with an imminent, unreasonable risk of overheating, arcing, fire, explosion or combustion leading to the destruction of personal and real property and physical injuries.

106)     Exelon, ComEd, and all five other power service subsidiaries continued to install these I-210+c smart meters despite their knowledge of the inherent risks and defects, and did so without warning its customers and continues to present consumers with an imminent, unreasonable risk of overheating, arcing, fire, explosion or combustion leading to the destruction of personal and real property and physical injuries without warning.

107)     On reasonable belief and information, all the other subsidiary corporations, namely BGE, ACE, PECO, PEPCO, and Delmarva, would have taken the same course of action, following the same guidelines, and same policies and procedures, as determined by Exelon Corporation, acting through its shared corporate services unit, Exelon Business Services LLC.

## COUNT I
## (BROUGHT BY PLAINTIFF JOEL HABICH INDIVIDUALLY)
## COMMONWEALTH EDISON COMPANY AND EXELON CORPORATION
## WILLFUL AND WANTON AND NEGLIGENCE

108)     The Plaintiff adopts, reasserts, and realleges paragraphs 1 through 103 as if set forth herein.

109)     At all times relevant hereto, EXELON and ComEd jointly and/or individually, and their predecessor and/or successor in interest, had a duty to provide the plaintiff with electricity supply by installing the proper and necessary equipment required for completing that duty in a careful and prudent manner, so as to protect and guard against the possibility of fire and fire-related damages to the lives and property of others when the equipment was used for its intended purpose.

110)     ComEd chose to install and equip the "Aclara I-210+c" model to provide the electricity supply to commercial and residential customers. ComEd specifically states that it would be responsible for deploying AMI meters in accordance with the AMI plan as approved by the Illinois Commerce Commission Order dt. Dec 16, 2021 in Docket No. 21-0810. ComEd further states that ComEd owns all equipment it installs and that it would continue to own the installed equipment even if repaired by an entity other than ComEd itself.

111)     EXELON directly authorized, approved and commanded the actions of ComEd and all its other subsidiaries by virtue of its ownership interests and disregarded the separate legal personality of its subsidiaries, including ComEd and exercised direct control over: the

decision to replace the older analog meters with the AMI smart meters; the decision to select smart meters manufactured by the ACLARA Defendants; the time table set by ComEd and other subsidiaries for the installation of the Smart Meters; the policy and procedure adopted by all the subsidiaries, including ComEd, for the installation protocol of the smart meters, and the protocol to be followed by all of the subsidiaries, including ComEd, in the inspection, maintenance and replacement of the Smart Meters.

112)    The control exercised by EXELON over the actions of its subsidiaries including ComEd, are beyond the accepted normal parental oversight of a subsidiary which amounted to a complete disregard of the separate legal personality of the subsidiary corporation, thus the negligent actions of ComEd and other subsidiaries can be traced to the direct involvement of the parent organization, EXELON, through its own conduct and personnel.

113)    EXELON specifically authorized, directed and controlled the exact manner in which its subsidiaries, including ComEd undertook the process of installing the AMI Smart Meters and knew that the injuries to the person and property of the consumers, including HABICH, were highly foreseeable, given the defects in the AMI Smart Meters, including without limitation the Aclara I-210+c smart meter.

114)    ComEd and EXELON violated the aforesaid duty by one or more of the following negligent acts and/or omissions:

      a)    Willfully, wantonly and negligently choosing to install the Aclara I-210+c smart meter, which had inherent design and manufacturing defects, thereby installing equipment that was not designed in a manner that presented the customer with the lowest permissible risk of overheating, arcing, fire, explosion or combustion; and/or

b) Willfully, wantonly and negligently failed to exercise due diligence in the proper installation of the I-210+c smart meter, including but not limited to identifying potential points of loose connections, checking the corrosion levels at the connection points and other potential issues that should have been identified as an overheating or fire-hazard so as to avoid the potential for causing a fire; and/or

c) Willfully, wantonly and negligently failed to provide proper training to installation technicians to conduct their due diligence and identify the above-mentioned factors and rectifying the same, before proceeding with the installation procedures, so as to avoid the potential for causing a fire; and/or

d) Willfully, wantonly and negligently failed to conduct adequate testing/ and other quality control measures on the Aclara I-210+c so as to ensure that it was properly manufactured and/or assembled as to avoid the potential for overheating, arcing, fire, explosion and/or combustion; and/or

e) Willfully, wantonly and negligently failed to warn or otherwise notify anyone and/or attach adequate warnings on the machine identifying the propensity of the Aclara I-210+c to overheat, even during normal operation, and thereby cause arcing, fire, explosion and/or combustion;

f) Willfully, wantonly and negligently allow previously installed Aclara I-210+c meters to remain in service with knowledge of an imminent risk to overheat, even during normal operation, and thereby cause arcing, fire, explosion and/or combustion; and/or

g) Negligently, carelessly and improperly trained and/or provided inadequate training and information to the users of the Aclara I-210+c AMI meter to be alert

to the propensity of a fire and/or identifying common causes of fires so as to be adequately prepared to respond in the event of such a fire.

115)     As a direct and proximate result of one or more of the foregoing willful and wanton and negligent acts and/or omissions on part of the defendants, the Aclara I-210+c smart meter overheated, causing arcing from the hot power in wiring causing a fire, which led to the total destruction of the building, the business and all personal belongings inside the building at 745 West 151st Street, Orland Park, County of Cook, State of Illinois, incurring heavy destruction to personal property, commercial property, and mental, psychological, emotional and personal injuries.

WHEREFORE, the Plaintiff, Joel Habich, Individually and as owner and operator of Don's Hot Dogs III, Inc. and owner of the building located on the premises, respectfully requests a judgment against the Defendants, EXELON and ComEd, in excess of the minimum jurisdictional limits of this Court, which will represent fair and just compensation.

### COUNT II
### (BROUGHT BY PLAINTIFF JOEL HABICH INDIVIDUALLY)
### ACLARA TECHNOLOGIES, LLC
### STRICT LIABILITY – PRODUCT LIABILITY

116)     The Plaintiff adopts, reasserts, and realleges paragraphs 1 through 103 as if set forth herein.

117)     The Defendant Aclara Technologies LLC, and its predecessors and/or successors in interest, engaged in the business of designing, manufacturing, marketing, selling, distributing, and providing training and other services associated with the Aclara I-210+c smart meter.

118)     The Aclara I-210+c smart meter was expected and did reach the Plaintiff, Joel Habich, without substantial change in its condition as manufactured, supplied, marketed, sold, advertised and otherwise distributed by the Defendant.

119)    The Aclara I-210+c smart meter, as designed and manufactured by the Defendant, was defectively designed and manufactured, unsafe, and unreasonably dangerous for its intended use when it left the Defendants control and at the time of the occurrence for one or more of these reasons:

    a)    The Aclara I-210+c smart meter lacked adequate warnings regarding the machine's propensity to overheat, malfunction and thereafter start a fire;

    b)    The Aclara I-210+c smart meter was defectively designed to cause a fire;

    c)    The Aclara I-210+c smart meter was improperly manufactured and/or assembled so as to cause a fire;

    d)    The components of the Aclara I-210+c smart meter were not designed in a fire-safe manner;

    e)    Alternative designs could have included known and well-tested heat-resistant materials including Bakelite on the backplate, voltage suppressors to prevent overheating in case of a voltage spike, and refrained from the use of plastic in a device containing digital circuitry to avoid the possibility of ignition and melting in case of over-heating;

    f)    The Aclara I-210+c smart meter did not contain a surge arrestor, which hampered the Smart Meter's ability to withstand voltage surges causing it to be a fundamentally weak meter;

    g)    The Aclara I-210+c smart meter was equipped with the remote disconnect function, which works by creating an arcing fault on purpose, which increases the risk of the Smart Meter to cause a fire, explosion or other combustion events.

h) The Aclara I-210+c smart meter uses digital circuitry, which helps the Defendant track the data usage per meter in a remote fashion. The use of such digital circuitry, mostly made using plastic components, makes the Smart Meter fundamentally and inherently unreasonably susceptible to a higher risk of fire, explosion or other combustion events.

i) The Aclara I-210+c smart meter was designed in such a way as to constitute an unreasonably dangerous susceptibility to fire, explosion, or other combustion events, even when used as intended.

j) The Aclara I-210+c smart meter has fundamental design defects in several of its components such as the lugs, thinner blades and hot sockets, which cause connectivity issues thereby unreasonably increasing their susceptibility to fire, explosion or other combustion events.

k) The components of the Aclara I-210+c smart meter was not manufactured/assembled in a fire-safe manner;

l) The Aclara I-210+c smart meter was not properly designed to limit potential internal overheating, which could lead to arcing and the possibility of fire;

m) The Aclara I-210+c smart meter was not properly fused electrically to limit potential internal arcing and the possibility of a fire;

n) There was not adequate testing and/or other quality control measures conducted on the Aclara I-210+c smart meter to ensure that it was properly designed to avoid the potential for causing a fire;

o) There was no adequate testing and/or quality control measures conducted on the Aclara I-210+c smart meter to ensure that it was properly manufactured and/or assembled to avoid the potential for causing a fire;

p) The Aclara I-210+c smart meter lacked adequate instructions as to the safe method of installation, set-up, and/or operation as to avoid the potential for causing a fire; and

q) The Aclara I-210+c line of smart meters had inherent manufacturing defects pertaining to a lack of adequate fire safety, Aclara had and has knowledge of this inherent defect during its testing, which are typically present as arcing damage to the housing, and still continued to manufacture, distribute, and sell this line of meters without even attempting to fix such inherent defects, despite the imminent risk of overheating, even during normal operation, and thereby causing arcing, fire, explosion and/or combustion.

120)    As a direct and proximate result of the unreasonably dangerous condition of the Aclara I-210+c smart meter, the Plaintiff Joel Habich, sustained damage and destruction to personal and commercial property and mental, psychological, emotional and personal injuries.

WHEREFORE, the Plaintiff, Joel Habich, respectfully requests a judgment against the Defendant, ACLARA TECHNOLOGIES LLC, in excess of the minimum jurisdictional limits of this Court, which will represent fair and just compensation.

**COUNT III**
**(BROUGHT BY PLAINTIFF JOEL HABICH INDIVIDUALLY)**
**ACLARA METERS, LLC -STRICT LIABILITY – PRODUCT LIABILITY**

121)    The Plaintiff adopts, reasserts, and realleges paragraphs 1 through 103 as if fully set forth herein.

122)     The Defendant Aclara Meters LLC, and its predecessors and/or successors in interest, engaged in the business of designing, manufacturing, marketing, selling, distributing, and providing training and other services associated with the Aclara I-210 line of meters, including the I-210+c smart meter.

123)     The Aclara I-210+c smart meter was expected and did reach the Plaintiff, Joel Habich, without substantial change in its condition as manufactured, supplied, marketed, sold, advertised and otherwise distributed by the Defendant.

124)     The subject Aclara I-210+c smart meter, as designed and manufactured by the Defendant, was defectively designed and manufactured, unsafe, and unreasonably dangerous for its intended use when it left the Defendants control and at the time of the occurrence for one or more of the following reasons:

a)    The Aclara I-210+c smart meter lacked adequate warnings regarding the machine's propensity to overheat, malfunction and thereafter start a fire;

b)    The Aclara I-210+c smart meter was defectively designed so as to cause a fire;

c)    The Aclara I-210+c smart meter was improperly manufactured and/or assembled so as to cause a fire;

d)    The components of the Aclara I-210+c smart meter were not designed in a fire-safe manner;

e)    Alternative designs could have included known and well-tested heat-resistant materials including Bakelite on the backplate, voltage suppressors to prevent overheating in case of a voltage spike, and refrained from the use of plastic in a device containing digital circuitry to avoid the possibility of ignition and melting in case of over-heating;

f) The Aclara I-210+c smart meter did not contain a surge arrestor, which hampered the Smart Meter's ability to withstand voltage surges thereby causing it to be a fundamentally weak meter;

g) The Aclara I-210+c smart meter was equipped with the remote disconnect function, which works by creating an arcing fault on purpose, which increases the risk of the Smart Meter to cause a fire, explosion or other combustion events.

h) The Aclara I-210+c smart meter uses digital circuitry, which helps the Defendant track the data usage per meter in a remote fashion. Using such digital circuitry, mostly made using plastic components, makes the Smart Meter fundamentally and inherently unreasonably susceptible to a higher risk of fire, explosion or other combustion events.

i) The Aclara I-210+c smart meter was designed in such a way as to constitute an unreasonably dangerous susceptibility to fire, explosion, or other combustion events, even when used as intended.

j) The Aclara I-210+c Smart meter has fundamental design defects in several of its components such as the lugs, thinner blades and hot sockets, which cause connectivity issues thereby unreasonably increasing their susceptibility to fire, explosion or other combustion events.

k) The components of the Aclara I-210+c smart meter was not manufactured/ assembled in a fire-safe manner;

l) The Aclara I-210+c smart meter was not properly designed to limit potential internal overheating, which could lead to arcing and the possibility of fire;

m) The Aclara I-210+c smart meter was not properly fused electrically to limit potential internal arcing and the possibility of a fire;

n) There was not adequate testing and/or other quality control measures conducted on the Aclara I-210+c smart meter to ensure that it was properly designed to avoid the potential for causing a fire;

o) There was no adequate testing and/or quality control measures conducted on the Aclara I-210+c smart meter to ensure that it was properly manufactured and/or assembled to avoid the potential for causing a fire;

p) The Aclara I-210+c smart meter lacked adequate instructions as to the safe and appropriate method of installation, set-up, and/or operation as to avoid the potential for causing a fire; and

q) The Aclara I-210+c line of smart meters had inherent manufacturing defects pertaining to a lack of adequate fire safety, Aclara had and has knowledge of this inherent defect during its testing, which are typically present as arcing damage to the housing, and still continued to manufacture, distribute, and sell this line of meters without even attempting to fix such inherent defects, despite the imminent risk of overheating, even during normal operation, and thereby causing arcing, fire, explosion and/or combustion.

125) As a direct and proximate result of the unreasonably dangerous condition of the Aclara I-210+c smart meter, the Plaintiff Joel Habich, sustained damage and destruction to personal and commercial property and mental, psychological, emotional and personal injuries.

WHEREFORE, the Plaintiff, Joel Habich, respectfully requests a judgment against the Defendant, ACLARA METERS LLC, in excess of the minimum jurisdictional limits of this Court, which will represent fair and just compensation.

## COUNT IV
## EXELON CORPORATION
## WILLFUL AND WANTON AND NEGLIGENCE
### (Brought as a Class Action by Plaintiff Joel Habich, on Behalf of All Other Similarly Situated)

126)     The Plaintiff and putative class members hereby adopt, reassert, and reallege paragraphs 1 through 103 as if fully set forth herein.

127)     The Plaintiff brings this count as a class action on behalf of other putative class members similarly situated under 735 ILCS 5/2 – 801, to recover damages owed.

128)     The Plaintiff and the putative class members, as a result of Exelon's willful, wanton and negligent act of purchasing, installing and/or maintaining I-210+c Smart Meters which they knew were defective, presented an imminent and unreasonably high risk of overheating that could lead to arcing, fire, explosion and combustion, suffered various degrees of personal and/or property damage.

129)     The proposed classes of similarly situated persons is defined as:

"All individuals and corporations residing in and/or located at Illinois, Maryland, Delaware, New Jersey, Pennsylvania, and the District of Columbia who suffered personal and/or property damage as a direct result of fire originating from the location of an Aclara I-210+c Smart Meter installed and/or maintained by Exelon, through and/or by its subsidiaries, affiliates, predecessors and/or successors, during the relevant statute of limitations."

130)     Common questions of law and fact exist as to all members of the class and predominate over any questions that affect only individual members of the class. The common questions of law and fact include:

i.   Whether EXELON by or through its subsidiaries properly trained their staff to look out for pre-existing issues with connectivity, to properly install and replace the old non-AMI meter with new AMI meters; and/or to utilize the correctly rated smart meter given the power demands of the customer and premises where the smart meter was being installed;

ii.  Whether EXELON by or through its subsidiaries exercised reasonable degree of care and attempted to address or remediate any known defects in the I-210+c Smart Meters that made them a fire hazard, such as overheating, and/or a direct or proximate source of fires;

iii. Whether EXELON by or through its subsidiaries, in complete disregard for the consequences of their actions, still continued to act willfully, wantonly and negligently in installing the defective I-210+c Smart Meters, even though they had prior knowledge that the Meters had a propensity to overheat, leading the melting of the insulation of the hot in wiring, arcing, fire, explosions and/or combustion;

iv.  Whether EXELON by or through its subsidiaries were negligent in failing to warn its power service customers of the higher risk of overheating, arcing, fire, explosion and/or combustion associated with the I-210+c smart meter.

131)     EXELON by or through its subsidiaries operated under a standard practice, as described above, which was willful, wanton and negligent, to deprive the Plaintiff and the putative class members of a right to basic safety against fire hazards solely motivated by their profits, causing various degrees of personal and/or property damage.

132) Plaintiffs and putative class members were subject to the control of EXELON and/or/through its subsidiaries, as the right to electricity is an essential commodity, and the plan used by the Defendant(s), including the replacement of the old non-AMI meter with the I-210+c Smart Meter and all procedures surrounding the installation of the same, were not subject to consultation or approval of the individual property owners.

133) EXELON directly authorized, approved and commanded the actions of all its subsidiaries by virtue of its ownership interests and disregarded the separate legal personality of its subsidiaries, and exercised direct control over: the decision to replace the older analog meters with the I-210+c smart meters; the decision to select smart meters manufactured by the ACLARA Defendants; the time table set by the subsidiaries for the installation of the Smart Meters; the policy and procedure adopted by all the subsidiaries for the installation protocol of the smart meters, and the protocol to be followed by all of the subsidiaries in the inspection, maintenance and replacement of the Smart Meters.

134) The control exercised by EXELON over the actions of its subsidiaries are beyond the accepted normal parental oversight of a subsidiary which amounted to a complete disregard of the separate legal personality of the subsidiary corporation, thus the negligent actions of the subsidiaries can be traced to the direct involvement of the parent organization, EXELON, through its own conduct and personnel.

135) It follows that EXELON specifically authorized, directed and controlled the exact manner in which its subsidiaries undertook the process of installing the I-210+c Smart Meters and knew that the injuries to the person and property of the consumers, including HABICH and the putative class members, were highly foreseeable, given the defects in the AMI Smart Meters, including without limitation the Aclara I-210+c smart meter.

136)     At all times relevant hereto, the actions of EXELON by or through its subsidiaries, to willfully, wantonly and negligently install the I-210+c Smart Meters and their failure to exercise reasonable care in installing the Meters, was the direct cause of the various degrees of the personal and/or property damage suffered by the Plaintiff and the putative class members.

137)     Plaintiff requests that the Court authorize notice to the members of the class to inform them of the pendency of this action, for the purpose of seeking damages relating to any personal and/or property damage, and other relief as a result of the willful, wanton and negligent actions of the EXELON and/or/through its subsidiaries.

138)     Plaintiff estimates that there are over sixty (60) putative members of the class in Illinois alone. The precise members of the class can be ascertained by using Exelon and/or/through its subsidiaries' service/client list, because only EXELON and its subsidiaries would be the only entity with a detail record of any instance of fire that was reported in the form of a complaint number.

139)     During discovery, ComEd has already provided a list of 61 prior consumer complaints relating to a fire and/or other combustion events involving the Aclara I-210+c in the state of Illinois, and further discovery will likely yield information on other consumers who face the imminent and unreasonable risk of overheating, even during normal operation, and thereby suffering from arcing, fire, explosion and/or combustion.

Wherefore, Plaintiff Joel Habich seeks the entry of an order of judgment against the Defendants EXELON under Count IV as follows:

    a)  Authorize notice at the earliest possible time informing the similarly situated putative class members/ victims that this action has been filed, of the nature of the

action, and of their right to join this lawsuit if they have suffered from an injury, personal or property damage, as a direct result of the willful, wanton and negligent actions of EXELON by or through its subsidiaries.

b) Order the Defendants EXELON by or through its subsidiaries to provide a list of all names and last known addresses of all putative class members who formerly and/or currently utilized the I-210+c Smart Meter, who were subjected to an injury or complained of a fire damage which originated from the location the I-210+c smart meter.

c) Declare and find that the Defendants committed one or more of the following acts:

   i) Failed to exercise reasonable care and due diligence in the installation of the I-210+c Smart Meters and/or failing to provide proper training in identifying and rectifying pre-existing connectivity issues that could lead to a fire before installation of the new I-210+c Smart Meter.

   ii) Willfully, wantonly and negligently installed the defective I-210+c Smart Meters knowing that the Meters were known to overheat, even during normal operating conditions, which could be fire hazards and that they were directly linked to fire accidents which caused several instances of personal and/or property damage and continue to pose an imminent risk of overheating, even during normal operation, and thereby causing arcing, fire, explosion and/or combustion.

d) Order equitable relief mandating that the Defendants cease and desist from any and all further installations until a good-faith effort to rectify known defects has

been undertaken and the I-210+c Smart Meters that are installed in the future

comply with all required safety standards and do not pose a threat of being a fire

hazard.

e) Award compensatory damages, including damages suffered as a result of personal

and/or property damage as a result of a fire accident that is directly linked to the

AMI Smart Meter.

f) Award all costs and reasonable attorneys' fees incurred in prosecuting this claim;

and

g) For such further relief as this Court deems just and equitable.

### COUNT V
### ACLARA TECHNOLOGIES, LLC -STRICT LIABILITY – PRODUCT LIABILITY
**(Brought as a Class Action by Plaintiff Joel Habich, on Behalf of All Others Similarly)**

140)     The Plaintiff adopts, reasserts, and realleges paragraphs 1 through 103 as if fully

set forth herein.

141)     The Plaintiff brings this count as a class action on behalf of other putative class

members similarly situated, pursuant to 735 ILCS 5/2-801, to recover damages owed.

142)     The Plaintiff and the putative class members, as a result of the Defendant

ACLARA TECHNOLOGIES LLC's manufacturing defect suffered various degrees of personal

and/or property damage because of incidents of fire arising out of the manufacturing defect.

143)     The proposed class of similarly situated persons are defined as:

"All individuals and corporations residing in and/or located in Illinois,

Pennsylvania, Maryland, New Jersey, and the District of Columbia who suffered

personal and/or property damage as a direct result of fire originating from the

location of an Aclara I-210+c Smart Meter installed and/or maintained by Exelon

and/or its subsidiaries, affiliates, predecessors and/or successors, during the relevant statute of limitations."

144)  Common questions of law and fact exist as to all members of the class and predominate over any questions that affect only individual members of the class. The common questions of law and fact include:

a.  Whether Defendant had knowledge about the fact that the lack of Bakelite on the backplate, propensity of the powered components to overheat, the remote disconnect feature and exclusion of other similar materials from the Smart Meters would cause it to present an unreasonable fire hazard;

b.  Whether Defendant, in light of that knowledge/ omission, decided to place the I-210+c product in the stream of commerce without warning customers of the propensity to overheat, which could cause arcing, fire, explosion and/or combustion, in its sole pursuit of profits;

c.  Whether Defendant, after having knowledge about incidents of fire due to the above-mentioned manufacturing defects, took any steps in good faith to recall, repair and/or at the minimum rectify those defects in future I-210+c Smart Meters that they were manufacturing.

145)  The Plaintiffs and putative class members were subject to the control of ACLARA TECHNOLOGIES LLC, as the right to electricity is an essential commodity in everyday life, and the plan used by Exelon and its subsidiaries to use Smart Meters manufactured by ACLARA TECHNOLOGIES LLC was not subject to consultation or approval of the individual property and business owners.

146)     At all times relevant hereto, ACLARA TECHNOLOGIES LLC's Aclara I-210+c smart meter, as designed and manufactured by the Defendant, was defectively designed and manufactured, unsafe, and unreasonably dangerous for its intended use at the time it left the Defendant's control and at the time of the occurrence for one or more of these reasons:

a)  The Aclara I-210+c smart meter lacked adequate warnings regarding the machine's propensity to overheat, malfunction and thereafter start a fire;

b)  The Aclara I-210+c smart meter was defectively designed to cause a fire;

c)  The Aclara I-210+c smart meter was improperly manufactured and/or assembled to cause a fire;

d)  The components of the Aclara I-210+c smart meter were not designed in a fire-safe manner;

e)  Alternative designs could have included known and well-tested heat-resistant materials including Bakelite on the backplate, voltage suppressors to prevent overheating in case of a voltage spike, and refrained from the use of plastic in a device containing digital circuitry to avoid the possibility of ignition and melting in case of over-heating;

f)  The Aclara I-210+c smart meter did not contain a surge arrestor, which hampered the Smart Meter's ability to withstand voltage surges thereby causing it to be a fundamentally weak meter;

g)  The Aclara I-210+c smart meter was equipped with the remote disconnect function, which works by creating an arcing fault on purpose, which increases the risk of the Smart Meter to cause a fire, explosion or other combustion events.

h) The Aclara I-210+c smart meter uses digital circuitry, which helps the Defendant track the data usage per meter in a remote fashion. The use of such digital circuitry, mostly made using plastic components, makes the Smart Meter fundamentally and inherently unreasonably susceptible to a higher risk of fire, explosion or other combustion events.

i) The Aclara I-210+c smart meter was designed in such a way as to constitute an unreasonably dangerous susceptibility to fire, explosion, or other combustion events, even when used as intended.

j) The Aclara I-210+c smart meter has fundamental design defects in several of its components such as the lugs, thinner blades and hot sockets, which cause connectivity issues thereby unreasonably increasing their susceptibility to fire, explosion or other combustion events.

k) The components of the Aclara I-210+c smart meter was not manufactured/ assembled in a fire-safe manner;

l) The Aclara I-210+c smart meter was not properly designed so as to limit potential internal overheating, even under normal operating conditions, which could lead to arcing and the possibility of fire;

m) The Aclara I-210+c smart meter was not properly fused electrically so as to limit potential internal arcing and the possibility of a fire;

n) There was not adequate testing and/or other quality control measures conducted on the Aclara I-210+c smart meter so as to ensure that it was properly designed so as to avoid the potential for causing a fire;

o)  There was no adequate testing and/or quality control measures conducted on the Aclara I-210+c smart meter so as to ensure that it was properly manufactured and/or assembled so as to avoid the potential for causing a fire;

p)  The Aclara I-210+c smart meter lacked adequate instructions as to the safe and appropriate method of installation, set-up, and/or operation as to avoid the potential for causing a fire.

q)  The Aclara I-210+c line of smart meters had inherent manufacturing defects pertaining to a lack of adequate fire safety, Aclara had and has knowledge of this inherent defect during its testing, which are typically present as arcing damage to the housing, and still continued to manufacture, distribute, and sell this line of meters without even attempting to fix such inherent defects, despite the imminent risk of overheating, even during normal operation, and thereby causing arcing, fire, explosion and/or combustion.

147)    At all times relevant hereto, the action of ACLARA TECHNOLOGIES LLC in defectively manufacturing the Smart Meters, including but not limited to the Aclara I-210+c, was the direct cause of the personal and/or property damages suffered by the Plaintiff and the putative class members.

148)    The Plaintiff requests that the Court authorize notice to the members of the class to inform them of the pendency of this action, for the purpose of seeking damages relating to any personal and/ or property damage, and other relief as a result of the manufacturing defect caused by ACLARA TECHNOLOGIES LLC.

149)    The Plaintiff estimates that there are over one hundred (100) putative members of the class. The precise members of class members can be ascertained by using ACLARA

TECHNOLOGIES LLC's service list which includes a detailed summary of all models sold and the number of fire complaints they have received either from individual consumers or from the distributors.

150)    During discovery, ComEd has already provided a list of 61 prior consumer complaints relating to a fire and/or other combustion events and involving the Aclara I-210 line of meters just in the state of Illinois.

151)    Further discovery will prove that there are more putative class members in the State of Illinois, and if Exelon complies with Plaintiff's discovery requests and provides information about the distribution of the meters it purchased, information about the putative class members in the other four states and District of Columbia can be ascertained.

152)    The Plaintiff has also obtained information relating to other prior complaints filed with ACLARA about fires and/or other combustion events arising out of the I-210+c line of smart meters, and further discovery from this defendant could provide information about putative class members in the above-mentioned jurisdictions, specifically with respect to the information about the entity purchasing the meters, where those meters were deployed, and any customer complaints.

WHEREFORE, the Plaintiff, Joel Habich, seeks a judgment against the Defendant, ACLARA TECHNOLOGIES LLC, under count V as follows:

a)    Authorize notice at the earliest possible time informing the similarly situated putative class members/ victims that this action has been filed, of the nature of the action, and of their right to join this lawsuit if they have suffered from an injury, personal and/ or property damage, as a direct result of the defective

manufacturing of the Smart Meters by Defendant ACLARA TECHNOLOGIES LLC.

b) Order the Defendant ACLARA TECHNOLOGIES LLC to provide a list of all names and last known address of its most major distributors and a complaint list containing every known complaint that they have ever received relating to a fire originating from a I-210+c Smart Meter manufactured and supplied by them.

c) Declare and find that the Defendant ACLARA TECHNOLOGIES LLC committed one or more of the following acts:

   i) Failed to exercise reasonable care and due diligence in the manufacture of the I-210+c Smart Meters, thereby manufacturing a product that made it unsafe and unreasonably dangerous for using it for its intended purpose.

   ii) Failed to take any good faith measures in an attempt to recall, repair or rectify the known defects in their sole pursuit of profits thereby continuing to manufacture and sell Electric Smart Meters with full knowledge that they are potential fire hazards.

   iii) Willfully, wantonly and negligently distributed the defective I-210+c Smart Meters knowing that the Meters were known to overheat, even during normal operating conditions, which could be fire hazards and that they were directly linked to fire accidents which caused several instances of personal and/or property damage and continue to pose an imminent risk of overheating, even during normal operation, and thereby causing arcing, fire, explosion and/or combustion.

d) Order equitable relief mandating that Defendant cease and desist from any and all further manufacturing until a good faith effort to rectify the known defects that the Defendant is already aware of and to rectify the defects so as to comply with all required safety standards and rigorous testing standards.

e) Award compensatory damages, including damages suffered as a result of personal and/ or property damage as a result of a fire accident that is directly linked to the Defendant's Electric Smart Meters.

f) Award all costs and reasonable attorneys' fees incurred in prosecuting this claim; and

g) For such further relief as this Court deems equitable.

**COUNT VI**
**ACLARA METERS, LLC -STRICT LIABILITY – PRODUCT LIABILITY**
**(Brought as a Class Action by Plaintiff Joel Habich, on Behalf of All Others Similarly)**

153) The Plaintiff hereby adopts, reasserts, and realleges paragraphs 1 through 103 as if fully set forth herein.

154) The Plaintiff brings this count as a class action on behalf of other putative class members similarly situated under 735 ILCS 5/2-801, to recover damages owed.

155) The Plaintiff and the putative class members, because of the Defendant ACLARA METERS LLC's manufacturing defect suffered various degrees of personal and/or property damage because of incidents of fire arising out of the manufacturing defect.

156) The proposed class of similarly situated persons are defined as:

157) "All individuals and corporations residing in and/or located in Illinois, Pennsylvania, Maryland, New Jersey, and the District of Columbia who suffered personal and/or property damage as a direct result of fire originating from the location

of an Aclara I-210+c Smart Meter installed and/or maintained by Exelon and/or its subsidiaries, affiliates, predecessors and/or successors, during the relevant statute of limitations."

158)     Common questions of law and fact exist as to all members of the class and predominate over any questions that affect only individual members of the class. The common questions of law and fact include:

a.   Whether Defendant had knowledge about the fact that the lack of Bakelite on the backplate, propensity of the powered components to overheat, the remote disconnect feature and exclusion of other similar materials from the Smart Meters would cause it to present an unreasonable fire hazard;

b.   Whether Defendant, in light of that knowledge/ omission, decided to place the I-210+c product in the stream of commerce without warning customers of the propensity to overheat, which could cause arcing, fire, explosion and/or combustion, in its sole pursuit of profits;

c.   Whether Defendant, after having knowledge about incidents of fire due to the above-mentioned manufacturing defects, took any steps in good faith to recall, repair and/or at the minimum rectify those defects in future I-210+c Smart Meters that they were manufacturing.

159)     The Plaintiffs and putative class members were subject to the control of ACLARA METERS LLC, as the right to electricity is an essential commodity in everyday life, and the plan used by Exelon and its subsidiaries to use Smart Meters manufactured by ACLARA METERS LLC was not subject to consultation or approval of the individual property and business owners.

160)     At all times relevant hereto, ACLARA METERS LLC's Aclara I-210+c smart meter, as designed and manufactured by the Defendant, was defectively designed and manufactured, unsafe, and unreasonably dangerous for its intended use at the time it left the Defendant's control and at the time of the occurrence for one or more of the following reasons:

a)  The Aclara I-210+c smart meter lacked adequate warnings with respect to the machine's propensity to overheat, malfunction and thereafter start a fire;

b)  The Aclara I-210+c smart meter was defectively designed so as to cause a fire;

c)  The Aclara I-210+c smart meter was improperly manufactured and/or assembled so as to cause a fire;

d)  The components of the Aclara I-210+c smart meter were not designed in a fire-safe manner;

e)  Alternative designs could have included known and well-tested heat-resistant materials including Bakelite on the backplate, voltage suppressors to prevent overheating in case of a voltage spike, and refrained from the use of plastic in a device containing digital circuitry to avoid the possibility of ignition and melting in case of over-heating;

f)  The Aclara I-210+c smart meter did not contain a surge arrestor, which hampered the Smart Meter's ability to withstand voltage surges thereby causing it to be a fundamentally weak meter;

g)  The Aclara I-210+c smart meter was equipped with the remote disconnect function, which works by creating an arcing fault on purpose, which increases the risk of the Smart Meter to cause a fire, explosion or other combustion events.

h) The Aclara I-210+c smart meter uses digital circuitry, which helps the Defendant track the data usage per meter in a remote fashion. The use of such digital circuitry, mostly made using plastic components, makes the Smart Meter fundamentally and inherently unreasonably susceptible to a higher risk of fire, explosion or other combustion events.

i) The Aclara I-210+c smart meter was designed in such a way as to constitute an unreasonably dangerous susceptibility to fire, explosion, or other combustion events, even when used as intended.

j) The Aclara I-210+c smart meter has fundamental design defects in several of its components such as the lugs, thinner blades and hot sockets, which cause connectivity issues thereby unreasonably increasing their susceptibility to fire, explosion or other combustion events.

k) The components of the Aclara I-210+c smart meter was not manufactured/ assembled in a fire-safe manner;

l) The Aclara I-210+c smart meter was not properly designed so as to limit potential internal overheating, even during normal operating conditions, which could lead to arcing and the possibility of fire;

m) The Aclara I-210+c smart meter was not properly fused electrically so as to limit potential internal arcing and the possibility of a fire;

n) There was not adequate testing and/or other quality control measures conducted on the Aclara I-210+c smart meter so as to ensure that it was properly designed so as to avoid the potential for causing a fire;

o)  There was no adequate testing and/or quality control measures conducted on the Aclara I-210+c smart meter so as to ensure that it was properly manufactured and/or assembled so as to avoid the potential for causing a fire;

p)  The Aclara I-210+c smart meter lacked adequate instructions as to the safe and appropriate method of installation, set-up, and/or operation as to avoid the potential for causing a fire; and

q)  The Aclara I-210+c line of smart meters had inherent manufacturing defects pertaining to a lack of adequate fire safety, Aclara had and has knowledge of this inherent defect during its testing, which are typically present as arcing damage to the housing, and still continued to manufacture, distribute, and sell this line of meters without even attempting to fix such inherent defects, despite the imminent risk of overheating, even during normal operation, and thereby causing arcing, fire, explosion and/or combustion.

161)  At all times relevant hereto, the action of ACLARA METERS LLC in defectively manufacturing the Smart Meters, including but not limited to the Aclara I-210+c, was the direct cause of the personal and/or property damages suffered by the Plaintiff and the putative class members.

162)  The Plaintiff requests that the Court authorize notice to the members of the class to inform them of the pendency of this action, for the purpose of seeking damages relating to any personal and/ or property damage, and other relief as a result of the manufacturing defect caused by ACLARA METERS LLC.

163)  The Plaintiff estimates that there are over one hundred (100) putative members of the class. The precise members of the class can be ascertained by using ACLARA METERS

LLC's service list which includes a detailed summary of all models sold and the number of fire complaints that they have received either from individual consumers or from the distributors.

164)     During discovery, ComEd has already provided a list of 61 prior consumer complaints relating to a fire and/or other combustion event involving the Aclara I-210+c line of meters just in the state of Illinois.

165)     Further discovery will prove that there are more putative class members in the State of Illinois, and if Exelon complies with Plaintiff's discovery requests, information about the putative class members in the other four states and District of Columbia can be ascertained.

166)     The Plaintiff has also obtained information relating to other prior complaints filed with ACLARA about fires and/or other combustion events arising out of the I-210 line of smart meters, and further discovery from this defendant could provide information about putative class members in the above-mentioned jurisdictions.

WHEREFORE, the Plaintiff, Joel Habich, seeks a judgment against the Defendant, ACLARA METERS LLC, under count VI as follows:

a) Authorize notice at the earliest possible time informing the similarly situated putative class members/ victims that this action has been filed, of the nature of the action, and of their right to join this lawsuit if they have suffered from an injury, personal and/ or property damage, as a direct result of the defective manufacturing of the Smart Meters by Defendant ACLARA METERS LLC.

b) Order the Defendant ACLARA METERS LLC to provide a list of all names and last known address of its most major distributors and a complaint list containing every known complaint that they have ever received relating to a fire because of any I-210+c Smart Meters manufactured and supplied by them.

c)  Declare and find that the Defendant ACLARA METERS LLC committed one or
    more of the following acts:

    i)  Failed to exercise reasonable care and due diligence in the manufacture of the
        I-210+c Smart Meters, thereby manufacturing a product that made it unsafe
        and unreasonably dangerous for using it for its intended purpose.

    ii) Failed to take any good faith measures in an attempt to recall, repair or rectify
        the known defects in their sole pursuit of profits thereby continuing to
        manufacture and sell I-210+c Smart Meters with full knowledge that they are
        potential fire hazards.

d)  Order equitable relief mandating that Defendant cease and desist from any and all
    further manufacturing until a good faith effort to rectify the known defects that
    the Defendant is already aware of and to rectify the defects so as to comply with
    all required safety standards and rigorous testing standards.

e)  Award compensatory damages, including damages suffered as a result of personal
    and/ or property damage as a result of a fire accident that is directly linked to the
    Defendant's I-210+c Smart Meters.

f)  Award all costs and reasonable attorneys' fees incurred in prosecuting this claim;
    and

g)  For such further relief as this Court deems equitable.

**JURY DEMANDED AS TO ALL COUNTS.**

                                    Respectfully submitted,
                                    By: Glen J. Dunn, Jr.

                                    /s/ Glen J. Dunn. Jr.

GLEN J. DUNN & ASSOCIATES, LTD.

Glen J. Dunn, Jr.
Dennis H. Stefanowicz, Jr.
**GLEN J. DUNN & ASSOCIATES, LTD.**
Attorneys for the Plaintiff
One East Wacker Drive
Suite 2510
Chicago, Illinois  60601